303 Ga. 43
FINAL COPY

S17A1978.  FLETCHER v. THE STATE.

GRANT, Justice.

Appellant Patrick Fletcher was found guilty of two counts each of malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony in connection with the April 2013 shooting deaths of Wayne and Octavia Brown.  Fletcher now appeals, asserting erroneous admission of "other acts" evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)").  Because any error in the admission of that evidence was harmless, we affirm.[1]

---

[1] The murders were committed on April 22, 2013.  Fletcher was indicted by a Ben Hill County grand jury.  At the conclusion of a trial held from June 22 to June 26, 2015, a jury found Fletcher guilty of two counts each of malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.  The trial court sentenced Fletcher to life imprisonment without parole for both malice murder convictions, running concurrently, plus five years consecutive for the possession of a firearm by a convicted felon convictions, which were made to run concurrent to each other.  The trial court purported to merge the remaining counts into the malice murder counts.  Although the trial court properly merged the aggravated assault counts with the malice murder counts, the felony

## I.

Viewed in the light most favorable to the jury's verdict, the evidence at trial showed that on the morning of April 22, 2013, Wayne and Octavia Brown were found shot to death in their home. Patrick Fletcher lived next door to the Browns with his girlfriend Taccarra Leverette in the Blue Gray Trailer Park in Fitzgerald, Georgia. Fletcher and the Browns were involved together in drug dealing.

The night before, neighbors saw Fletcher running out of his trailer and heard him yelling "these mother f*****s are going to die tonight." It was apparent that Fletcher was referring to the Browns, and in response to an inquiry from one neighbor, Fletcher said that "they had snitched and that they were going to die tonight and that this girl was coming down from Atlanta and she was going to whip her a** and he knows that she could." Another neighbor heard Fletcher yell that the Browns "are the po-po and they are going to die."

murder counts should have been vacated by operation of law. See *Culpepper v. State*, 289 Ga. 736, 737-739 (715 SE2d 155) (2011).

Fletcher filed a timely motion for new trial on July 13, 2015, which was subsequently amended. A hearing was held on the motion on December 1, 2016, and the motion was denied, as amended, on December 12, 2016. Fletcher filed his notice of appeal on December 21, 2016. The appeal was docketed to the August 2017 term of this Court and thereafter was submitted for a decision on the briefs.

When the Browns arrived home, neighbors saw Fletcher run to their vehicle and begin talking loudly.

Later that night, sometime after 11:00 p.m., Fletcher called Wayne's cousin Kourtney Campbell, who overheard Fletcher "fussing" with Octavia and claiming that she had tried to set up a mutual associate named Terrance Thornton, also known as "Ransey," in a drug deal with police. Around that same time, another friend of the Browns, Patricia Walker, called Octavia, who told her that Fletcher was "nutting up and acting all crazy" about Octavia and Wayne being "snitches." Octavia also told Walker that she was trying to contact Ransey to tell him that she and Wayne were "not like that."

Around 3:00 a.m., another neighbor heard three gunshots. After a pause, two more gunshots followed. Fletcher had been seen carrying a handgun a few weeks before. Around dawn, Fletcher's girlfriend approached Norman Hodges, the trailer park's maintenance man, and asked him to accompany her to check on the Browns' residence because no one was answering the door. The storm door was closed, but the inside door was partially open; Hodges saw Octavia sitting in a chair covered in blood and not moving. He called his employer, who in turn called 911.

Law enforcement arrived and began investigating the scene. A crowd gathered as word of the Browns' death spread, including neighbors, friends and family of the Browns, and Fletcher. Fletcher made many statements to those around him that morning. Fletcher's statements were incriminating, were inconsistent (with each other, with later statements he made to police, with his alibi, or with evidence that was later discovered), and included information that he should not have known at that time if he were innocent of the killings. For example, when Campbell arrived at the scene, she repeatedly confronted Fletcher with her suspicion that he had killed the Browns, and Fletcher would only smile in response each time she asked; Campbell's distrust had been heightened because earlier that morning, Fletcher had laughed and told Campbell on the phone that the Browns were "stanking a** dead." Fletcher also told Wayne's cousin, with what would have been remarkable accuracy for someone not involved in the killings, that "Octavia had been beat and shot in the eye and Wayne had been beat and shot in the head"; his explanation was that "they were snitches and that's what snitches get." And Fletcher told a neighbor in the crowd that somebody killed the Browns because "they had snitched." Fletcher separately told several members of the Browns' family that he went to the Browns' trailer that morning, peeped through the door, and

could see that something was wrong; because Octavia appeared to be sitting in a recliner bloodied and beaten, he went back home and told his girlfriend to check on them. While police were still inside with the bodies, Fletcher announced to another bystander that Wayne had been shot in the head execution style. This contention was also accurate.

After Fletcher was arrested for the murders, his cellmate, Jeffrey Cole, a convicted felon, testified that Fletcher admitted to murdering the Browns with Tommy Belmer, another drug associate. Cole testified that Fletcher told him that Belmer shot Wayne "execution style" and that Fletcher then shot Octavia because "he knew she would tell on them" and "they were snitches and they were trying to set Ransey and DeLow up"; Ransey had paid them for the killings. Fletcher also said that he cleaned up with bleach, burned his clothes, and "ran around" the mobile home park "messing around to throw the heat off." As he explained it to Cole, Fletcher then went back in to sit Octavia up on the couch, and asked his girlfriend to get Norman to come over and find the bodies. Fletcher further informed Cole that he preferred revolvers because they do not drop shells, and that he had burned and buried the gun he used in the killings. Fletcher also admitted that he was "messing with" Octavia; Wayne

had found out, but Fletcher, for obvious reasons, did not want his girlfriend to find out too.

Fletcher was interviewed three times by law enforcement.  In those interviews, he claimed that the last time that he saw the Browns was at 7:30 p.m. on the night of the murders; he denied knowing about anyone who might have thought that the Browns were "snitches"; and he said he didn't receive any phone calls between 7:00 p.m. and 7:00 a.m. on the night of the murders. Fletcher's cell phone records, however, showed that he placed and received multiple phone calls on the night of the murders between himself, another associate in the drug trade named J. T., and Campbell.

In addition to hearing testimony that established the facts above at trial, the jury also heard from a courtroom deputy who saw Fletcher speaking with Campbell, a key witness, and Wayne's mother Angela Jordan, another witness, in the courtroom prior to trial.  According to the deputy, Fletcher told the two witnesses that "the clock is ticking.  You are going to get what's coming to you."

Although Fletcher has not challenged the sufficiency of the evidence supporting his convictions, we have independently examined the record according to our usual practice in murder cases and conclude that the evidence

admitted at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Fletcher was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

## II.

Fletcher asserts a single ground for reversal, claiming that the trial court erred in overruling his objection to the admission of the following "other acts" evidence under Rule 404 (b): (1) a 1999 conviction where Fletcher pled guilty to two counts of selling cocaine; (2) a 1999 conviction where Fletcher pled guilty to sale of a counterfeit substance, aggravated assault (brandishing a handgun during the transaction), and possession of a firearm during commission of a crime; (3) a 2000 conviction where a jury found Fletcher guilty of armed robbery; and (4) evidence of a 2011 traffic stop and arrest where law enforcement attempted to stop Fletcher after they confirmed he had an active arrest warrant; where he failed to stop until a PIT maneuver was performed; and where officers discovered crack cocaine and marijuana on his person. Rule 404 (b) provides:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for

other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

The Rule is, on its face, "an evidentiary rule of inclusion which contains a non-exhaustive list of purposes other than bad character for which other acts evidence is deemed relevant and may be properly offered into evidence." *State v. Jones*, 297 Ga. 156, 159 (773 SE2d 170) (2015) (citing *United States v. Jernigan*, 341 F3d 1273, 1280 (11th Cir. 2003)). But despite its inclusive nature, Rule 404 (b) "prohibits the admission of such evidence when it is offered *solely* for the impermissible purpose of showing a defendant's bad character or propensity to commit a crime." Id. (emphasis in original). Consequently, we use a three-part test to determine if evidence of other uncharged acts is admissible: (1) it must be relevant to an issue other than defendant's character; (2) it must be supported by sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) it must satisfy Rule 403. Id. (citing *Bradshaw v. State*, 296 Ga. 650, 656 (769 SE2d 892) (2015); *United States v. Edouard*, 485 F3d 1324, 1344 (11th Cir. 2007); *United States v. Delgado*, 56 F3d 1357, 1365 (11th Cir. 1995)). "A trial court's decision to admit other acts evidence will be overturned only where there is a clear abuse of discretion." Id.

Fletcher may be correct that some or all of the evidence he cites was improperly admitted, but we need not reach that determination because any error was harmless. See *Davis v. State*, 301 Ga. 397, 400 (801 SE2d 897) (2017) (pretermitting finding of error in admission of other acts evidence because strong evidence of guilt made any such error harmless). "In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Peoples v. State*, 295 Ga. 44, 55 (757 SE2d 646) (2014) (citations and punctuation omitted); see also *Rivera v. State*, 295 Ga. 380, 382 (761 SE2d 30) (2014). If "it is highly probable that the error did not contribute to the verdict," then the error is harmless and the conviction will stand. *Smith v. State*, 299 Ga. 424, 432 (788 SE2d 433) (2016) (citation and punctuation omitted). Where evidentiary error is deemed harmless, it is often true that the improper evidence was only "marginal" to the prosecution's case. *Johnson v. State*, 301 Ga. 277, 280 (800 SE2d 545) (2017).

Here, Fletcher was heard by multiple people threatening the lives of the victims the night of the murders, and he made numerous incriminating statements after the murders—some of which concerned information only the

killer could have known. His jailhouse confession was both detailed and consistent with his statements to other parties before the murders. It was also consistent with the fears that Octavia expressed to her friends. Moreover, his alibi and other statements to law enforcement were contradicted by his own inconsistent statements, the testimony of witnesses, and phone records.

Considering the quantity and strength of the evidence against Fletcher, it is highly probable that any error in admitting these "other acts" did not contribute to the verdict, especially considering that other evidence also showed the jury that Fletcher was involved in drug dealing. See *Hood v. State*, 299 Ga. 95, 105-106 (786 SE2d 648) (2016) (evidence that defendant sold drugs on other occasions was harmless because inculpatory evidence was strong); *United States v. Sterling*, 738 F3d 228, 239 (11th Cir. 2013) (evidence of 15-year-old bank robbery conviction was harmless because of otherwise overwhelming evidence of guilt); *United States v. Brown*, 344 F. App'x 555, 555-559 (11th Cir. 2009) (evidence of two prior firearm convictions, which included documentation of other crimes and habitual felony offender status, was harmless because of overwhelming evidence of guilt). We simply cannot see any likelihood that the jury would have weighed the case differently in the absence of the other acts evidence. Accordingly, Fletcher's contentions fail.

Judgment affirmed.  All the Justices concur.

Decided February 5, 2018.

Murder. Ben Hill Superior Court. Before Judge Pridgen.

David J. Walker, for appellant.

Bradford L. Rigby, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.