307 Ga. 865
FINAL COPY

S19A1182. HOWELL v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Aaron Howell was convicted of malice murder, aggravated assault, and aggravated battery in connection with the beating death of Paul Guerrant. Appellant contends that the evidence presented at his trial was legally insufficient to support his convictions and that the trial court erred by admitting other act sevidence under OCGA § 24-4-404 (b). As explained below, we affirm Appellant's murder conviction, although we vacate his convictions for aggravated assault and aggravated battery to correct merger errors.[1]

---

[1] The crimes occurred on December 22, 2014. On June 25, 2015, a Whitfield County grand jury indicted Appellant for malice murder, two counts of felony murder, aggravated assault (attempting to commit a violent injury by striking Guerrant's head with a blunt object), and aggravated battery (seriously disfiguring Guerrant's head by repeatedly striking him with a blunt object). At a trial from April 10 to 18, 2017, the jury found Appellant guilty of all charges. The trial court sentenced him to serve life in prison without the possibility of parole for malice murder and concurrent terms of 20 years each for aggravated assault and aggravated battery. The felony murder counts were

1. (a) Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Around 8:00 p.m. on December 22, 2014, Guerrant, who was homeless but staying with a friend in Dalton, attended an Alcoholics Anonymous meeting at a church on Emery Street. Guerrant left the meeting around 9:00 and walked along Morris Street toward the house where he was staying at 1108 Dozier Street. As Guerrant walked, he spoke to a friend on his cell phone from 9:14 until 9:28; nothing sounded unusual during the conversation.

At 9:36 p.m., a woman who lived at 1020 Dozier Street called 911 and reported that a man who was bleeding from his head was lying in the street. The responding police officer found a white man, who was later identified as Guerrant, lying face down in the street, unresponsive. It was raining heavily, and there was a large pool of

vacated by operation of law. (As discussed in Division 2 below, the trial court erred by failing to merge the guilty verdicts for aggravated assault and aggravated battery into the murder conviction.) Appellant filed a timely motion for new trial, which he later amended with new counsel. After a hearing, the trial court denied the motion on February 1, 2019. On March 11, 2019, Appellant filed a motion for out-of-time appeal, which the trial court granted. Appellant then filed a timely notice of appeal, and his case was docketed to the August 2019 term of this Court and submitted for decision on the briefs.

blood near Guerrant's head, which looked "caved in." Guerrant's cell phone was attached to his belt, and his wallet was in his pocket.

Guerrant was taken to a hospital, where he soon died from his head injuries. The medical examiner who performed Guerrant's autopsy determined that he had suffered at least 20 impacts to his head. He had extensive fractures on the left side and back of his skull; multiple abrasions and lacerations on the left side and back of his scalp and on his left ear; several abrasions on his left shoulder and back; and lacerations on the back of his right hand. Blood spatter analysis of an SUV that was parked near where Guerrant was found showed that at some point after the first blow, his head was about two feet from the ground as he was repeatedly struck again.

About two weeks later, in early January 2015, James Williams, Jr., met Appellant, who was homeless, near a community center on North Frederick Street. Williams bought cigarettes and alcohol for himself and Appellant, and they began walking toward Williams's house. Appellant told Williams, who was aware of the recent

3

murder, that Appellant had "killed somebody the other day"; that it was "a white dude"; and that he had "beat him" because "he was talking smack to [Appellant]." As Appellant and Williams passed a wooded area north of Dozier Street, a few blocks from the community center, Appellant said, "that's where I threw everything at over there." Williams joked that Appellant was "a killer," and Appellant laughed. Appellant and Williams then drove to Chattanooga, Tennessee, where Williams bought them cocaine. They returned to Williams's house in Dalton, where Williams left Appellant while he drove back to Chattanooga to buy more cocaine. Later that night, Williams ran out of money and cocaine, and he began to feel depressed and suicidal. He went to a hospital and was involuntarily admitted to a facility in Chattanooga for treatment of cocaine psychosis.

Williams later called his mother from the treatment facility and told her that Appellant had been involved in a murder, that Appellant was at Williams's house, and that Williams wanted Appellant to leave. The mother phoned another relative, who called

911 on January 7 and recounted what Williams had said about Appellant. Detectives then responded to Williams's house, where they found Appellant.[2]

That evening, Appellant was interviewed at the police station for about five-and-a-half hours, including several breaks; most of the interview was video recorded, and the recording was played for the jury at trial.[3] Near the beginning of the interview, detectives asked Appellant about his telling Williams that he had killed someone, and Appellant claimed that he and Williams had been talking about spirituality and that Appellant had told Williams "I'm a murderer spiritually" because Appellant was at war with the devil and

---

[2] Detectives interviewed Williams on three different occasions; the interviews were audio recorded, and the recordings were later played for the jury. In the first interview, Williams claimed that he initially met Appellant about two weeks before they drove to Chattanooga together. The rest of Williams's statements to the police, however, were largely consistent with his trial testimony. Williams also testified that after his police interviews, he learned that there was a reward for information in this case, but that he had not received anything in exchange for his interview statements or testimony.

[3] The lead detective for the case testified that an approximately one-hour-long portion from the middle of Appellant's interview did not record properly. The time stamps on the recording show a gap of closer to one hour and 40 minutes, but that time may have included breaks.

demons.[4] Appellant then told detectives that on the day Guerrant was killed, Appellant spent time at the community center; ate dinner at Providence Ministries; walked back toward the community center around 5:00 p.m. with a friend he knew as "Jay"; walked separately from "Jay" after they reached Shaw Street; stayed at the community center until it closed around 9:00 p.m.; and then walked to a friend's apartment on James Street, which is several blocks north of Dozier Street, where he spent the night because it was raining. Appellant also said that he kept two backpacks hidden in some bushes. (The backpacks were later located near Janice Street,

---

[4] Appellant discussed God, the Bible, and an impending revelation throughout his police interview. Many of his statements were nonsensical and disconnected from the questions that the detectives asked. At one point, Appellant said that he hears people speaking to him and indicated that he had been diagnosed as schizophrenic and bipolar. Because of his bizarre statements, Appellant was taken to a hospital when the interview was concluded, but he apparently was soon discharged.

Before trial, Appellant's counsel requested a competency evaluation, and in February 2016, the trial court found Appellant incompetent to stand trial. In a June 2016 report, psychologists with the Department of Behavioral Health and Developmental Disabilities diagnosed Appellant with schizoaffective disorder (bipolar type) and cannabis use disorder but determined that he had been restored to competency. After a hearing, the trial court issued an order in September 2016 declaring Appellant competent for trial. Appellant moved to suppress his interview statements, but the trial court denied the motion, and Appellant does not challenge that ruling in this appeal.

about 100 yards south of the crime scene.) Appellant claimed that he was not near Dozier Street on the night of the murder and that he was not involved in the murder.

Detectives then showed Appellant a picture of Guerrant, and Appellant said that Guerrant was "Jay." The detectives later left Appellant alone in the interview room, and Appellant looked at Guerrant's photo and said, "dead, dead be alive right now if . . . sh*t . . . get out of my sh*t . . . been down here, all in my sh*t, playing with my sh*t, d*mn, but I saved you. I cannot admit it sure enough. Be at peace, young brother."

After the detectives returned to the room, Appellant was asked again if he killed Guerrant, and he said "no" while "nodding his head up and down." During the interview, detectives obtained video surveillance recordings from the community center. The recording from December 22 (the night of the murder) showed that Appellant wore an orange ski cap and a dark jacket with gray trim when he left the center at 9:01 p.m.; that he was not carrying a backpack; and that he walked southward toward Morris Street, Dozier Street, and

7

Janice Street, not north toward James Street as he had claimed. The recording from the next morning showed that Appellant was no longer wearing that cap or jacket when he arrived at the community center at 8:55 a.m. and that he had come from the direction of James Street. The community center surveillance recordings from the following week also showed that Appellant was not wearing the orange cap or dark jacket with gray trim.

A detective asked Appellant where the cap and jacket were; Appellant claimed that he had thrown them away at his friend's apartment on James Street, but he had no explanation when asked why a homeless man like him would discard warm clothes at the start of winter.[5] Appellant later said, "The will of man and justice, I admitted that I'm guilty against it, but I never said, okay, I was defending myself. . . . [H]ow can I tell justice that I was defending myself when all the evidence is on me that I was the offensor?"

---

[5] A detective testified about this discussion and Appellant's statement denying that he had killed Guerrant while nodding his head yes, explaining that these statements were made during the middle part of the interview that was not properly recorded. See footnote 3 above.

The day after the interview (January 8), detectives searched the wooded area north of Dozier Street where Appellant had told Williams that he "threw everything" after the murder. They found a dark jacket with gray trim hanging from a tree limb and an orange ski cap with two small bloodstains on it hanging from a nearby branch. Testing later showed that the DNA profile of skin cells found on the cap matched Appellant; the blood on the cap was human but not in sufficient quantity to make a DNA match. On January 9, detectives found a ball-peen hammer at the edge of the wooded area near Dozier Street. At trial, the medical examiner testified that the hammer was consistent with Guerrant's injuries, particularly with several curvilinear lacerations on his scalp.[6]

Appellant was arrested on April 8, 2015. Detectives interviewed him again; the interview was video recorded, and the

---

[6] The hammer and the jacket were tested for the presence of blood; the results were inconclusive. A GBI serologist testified that the rainy conditions before the hammer and jacket were found could have prevented the recovery of blood evidence on those items. In addition, a detective testified that the hammer was not submitted for fingerprint testing because its exposure to the elements likely would have prevented the recovery of fingerprint evidence.

recording was later played for the jury. During this interview, Appellant claimed that he did not know Guerrant; that he threw away his cap and jacket "because it was necessary to throw [them] away" and "because it was time for new clothes"; and that he threw them away not at his friend's apartment on James Street but "wherever [he] chose" and "wherever [they] might have been found."

The State's theory of the case was that Appellant killed Guerrant because he believed that Guerrant had found and "play[ed] with" Appellant's backpacks that were hidden near the crime scene. In addition to the evidence described above, the State presented testimony from Samuel Williams ("Samuel") that Appellant came to his apartment on James Street sometime before midnight on a rainy night in December 2014; that Appellant was carrying a backpack but was not wearing an orange cap when he arrived; and that he was very tired and immediately went to sleep on the floor.[7]

---

[7] It appears that Samuel Williams is not related to James Williams, Jr. Samuel testified on direct examination that Appellant arrived around 9:00 or

Appellant did not testify. His defense theory was that someone else committed the murder and that the case was not thoroughly investigated. To support that theory, his counsel pointed to the lack of physical evidence connecting Appellant to the murder, particularly the lack of evidence of Guerrant's blood on the orange ski cap or dark jacket with gray trim. Appellant's counsel argued that Appellant did not have a motive to kill Guerrant, that Appellant was at Samuel's apartment by the time of the murder, and that Williams was not credible. Appellant's counsel also asserted that Williams could have killed Guerrant, but the State presented evidence that Williams had been released from a jail in Chattanooga at 8:27 on the night of the murder and that his father had picked

10:00 p.m.; that a woman Samuel knew arrived sometime after midnight; and that Appellant arrived before her sometime prior to midnight. On cross-examination, Samuel testified that he had been drinking and smoking marijuana that night, which probably affected his perception of time and "how well [he] took in information"; that he did not remember exactly when Appellant arrived but that it "seemed like" it was about three or four hours before the woman arrived; and that Samuel did not notice any blood, scratches, or mud on Appellant.

As discussed in Division 3 below, the State also introduced evidence that Appellant used a fork to stab another homeless man in the back at a shelter in Florida in October 2012 and was convicted of misdemeanor battery.

him up at the jail around 9:15, driven him to Dalton, and dropped him off at his house there around 9:45 or 10:00, about 10 to 25 minutes after Guerrant was fatally injured.

(b) Appellant contends that the evidence presented at his trial was wholly circumstantial and did not exclude every other reasonable hypothesis except that of his guilt. See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). We disagree.

Contrary to the premise of Appellant's argument, the State presented some direct evidence of his guilt. During Appellant's police interview, a detective asked if Appellant had killed Guerrant, and Appellant nodded his head yes (while saying no). Appellant then indicated his involvement in the murder again when he was left alone in the interview room and spoke to Guerrant's photo, saying that Guerrant would still be alive if he had not been "playing with [Appellant's] sh*t." In addition, Appellant confessed to Williams —

12

an essentially disinterested witness who initially reported the confession not to the police but to his mother — that Appellant had recently beaten and killed a white man who had been "talking smack" to him and that he had thrown "everything" related to the murder in a wooded area nearby. See, e.g., *Merritt v. State*, 292 Ga. 327, 329 (737 SE2d 673) (2013) (explaining that the defendant's text message to his sister saying that he killed his wife was direct evidence of his guilt, because he confessed in the text the "'main fact, from which the essential elements of the criminal act may be inferred'" (citation omitted)); *Stubbs v. State*, 265 Ga. 883, 885 (463 SE2d 686) (1995) (explaining that "[d]irect evidence is that which is consistent with *either* the proposed conclusion *or* its opposite," whereas "circumstantial evidence is that which is consistent with *both* the proposed conclusion *and* its opposite" (emphasis in original)). Although Appellant challenged the credibility and interpretation of these incriminating statements, which may have affected the weight of that evidence, those challenges did not render the evidence circumstantial. See, e.g., *Walker v. State*, 295 Ga. 688,

691 (763 SE2d 704) (2014).

Moreover, the State also presented compelling circumstantial evidence that Appellant killed Guerrant. When detectives searched the wooded area where Appellant admitted to Williams that he "threw everything" related to the murder, they found significant physical evidence corroborating Williams's account — a hammer, a jacket, and an orange ski cap that had Appellant's skin cells and human blood on it. The medical examiner testified that the hammer was consistent with the murder weapon, and surveillance video showed Appellant wearing the jacket and cap about a half hour before the murder as he walked in the direction of the crime scene and not wearing the jacket and cap in the days after the murder. In addition, Samuel testified that when Appellant arrived at his apartment, he was not wearing the orange ski cap.

Appellant also gave shifting accounts and made other incriminating statements during his two police interviews. He initially told the detectives that he knew Guerrant as a man named "Jay" and admitted that he walked with the man toward the

14

community center hours before the murder, but later claimed that he did not know Guerrant at all. When the detectives asked about Appellant's jacket and ski cap, he first asserted that he threw them away at the apartment on James Street, but later said that he threw them "wherever [they] might have been found," and he had no plausible explanation for why he would discard warm clothes at the start of winter. Appellant also claimed that he walked to the apartment on James Street when he left the community center on the night of the murder, but surveillance video showing him walking in the direction of the crime scene discredited that claim.

Appellant contends that this evidence did not exclude the hypothesis that someone else committed the murder, because no blood or fingerprint evidence directly linked him to the crimes (although human blood was found on the cap that he discarded in the woods). A detective testified, however, that based on his blood spatter analysis of the crime scene, Guerrant's attacker may not have gotten blood on him if he had stood over Guerrant's back while striking Guerrant's head, which was near the ground at some point

15

after the first blow. The State also presented testimony that the rainy weather around the time of the murder may have prevented the recovery of blood evidence on the hammer and jacket and fingerprint evidence on the hammer. In any event, "'[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence,'" such as DNA or fingerprint evidence. *Jordan v. State*, 303 Ga. 709, 711 (814 SE2d 682) (2018) (citation omitted).

Appellant also points to Samuel's testimony that Appellant arrived at his apartment around 9:00 or 10:00 p.m. and that he did not notice any blood, scratches, or mud on Appellant. Video surveillance, however, showed that after Appellant left the community center at 9:01 on the night of the murder, he walked in the direction of the crime scene, not toward Samuel's apartment as Appellant had claimed to police. And although Samuel said that Appellant arrived around 9:00 or 10:00 p.m., he also testified that he did not remember exactly when Appellant arrived and that it was just sometime before midnight. In addition, Samuel admitted that

16

his drinking and smoking marijuana that night affected his perception.

Viewed as a whole and in the light most favorable to the jury's verdicts, see *McKie v. State*, 306 Ga. 111, 115 (829 SE2d 376) (2019), the State's evidence, including Appellant's own confessions, incriminating comments, and false statements as well as the circumstantial evidence, was strong and (even assuming that OCGA § 24-14-6 applied) certainly sufficient for the jury to reject as unreasonable the hypothesis that someone other than Appellant killed Guerrant. See *Outler v. State*, 305 Ga. 701, 703 (827 SE2d 659) (2019) (explaining that whether the evidence excluded every reasonable hypothesis but that of guilt is a question for the jury and that this Court will not disturb the jury's finding unless it is insupportable as a matter of law). The evidence was also sufficient as a matter of constitutional due process to authorize a rational jury to find beyond a reasonable doubt that Appellant was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*,

17

285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Although Appellant does not raise the issue, the trial court erred by failing to merge the guilty verdicts on the aggravated assault and aggravated battery counts into his malice murder conviction. Those counts all were based on the same act of Appellant striking Guerrant in the head with a blunt object, and there was no evidence that the crimes were separated by a deliberate interval. See, e.g., *Spell v. State*, 305 Ga. 822, 824 (828 SE2d 345) (2019); *Regent v. State*, 299 Ga. 172, 174-176 (787 SE2d 217) (2016). Accordingly, we vacate Appellant's convictions and sentences for aggravated assault and aggravated battery. See *Spell*, 305 Ga. at 824 (noting this Court's discretion to correct merger errors on direct appeal).

3. Appellant contends that the trial court erred by admitting evidence under OCGA § 24-4-404 (b), which says that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the

18

character of a person in order to show action in conformity therewith," but that such evidence may be admissible for other purposes, including to prove "intent." Georgia courts evaluate the admission of evidence under OCGA § 24-4-404 (b) using a three-part test derived from Eleventh Circuit case law.[8] The party offering the other acts evidence must show that:

> (1) the evidence is relevant to an issue in the case other than the defendant's character; (2) the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Kirby v. State*, 304 Ga. 472, 479 (819 SE2d 468) (2018).

At a pretrial hearing, the prosecutor proffered that the other acts evidence would show that at a homeless shelter in Florida about two years before Guerrant's murder, Appellant stabbed another homeless man in the back with a fork after they argued, and Appellant pled guilty to misdemeanor battery based on that conduct.

---

[8] Because OCGA § 24-4-404 (b) is modeled on Federal Rule of Evidence 404 (b), we look to the decisions of the federal appellate courts, particularly the decisions of the Eleventh Circuit, for guidance in construing and applying the rule. See *Kirby v. State*, 304 Ga. 472, 480 n.5 (819 SE2d 468) (2018).

19

Over Appellant's objection, the trial court ruled that the evidence of the Florida incident would be admitted for the purposes of showing Appellant's intent and motive. At trial, the State presented the other acts evidence through a video recording (without audio) of the Florida incident authenticated by a manager of the homeless shelter, testimony from the responding police officer who interviewed Appellant, photos of the victim's very minor injuries, and copies of the police report and Appellant's misdemeanor conviction. The trial court instructed the jury before the evidence was admitted and again in its final charge that the jury could consider the other acts evidence only for the purpose of showing Appellant's intent with regard to the crimes charged in this case; the instructions did not mention motive.[9]

---

[9] The trial court instructed:

> Sometimes evidence is admitted conditionally, that is, although you have been permitted to hear the evidence, it is only admitted and you may only consider it if you also find certain required predicate facts which allow you to consider such evidence. If you do not find the conditions necessary in order to allow you to consider the evidence, then you must disregard it completely, even though you've heard the evidence.

The criminal intent involved in the assault and battery on the Florida victim was included in the intent elements the State had to prove with regard to the charged aggravated assault and aggravated battery (and the felony murder counts based on those crimes), so the other acts evidence satisfied the first part of the OCGA § 24-4-404 (b) test. See *Olds v. State*, 299 Ga. 65, 72 (786 SE2d 633) (2016) ("[E]vidence that an accused committed an intentional act generally

---

In order to prove their case on murder, aggravated assault, and aggravated battery, the State may present evidence of other offenses for the purpose of showing the defendant's intent. To do so, the State has offered evidence of another offense allegedly committed by the accused. You are permitted to consider that evidence for its bearing on any matter to which it is relevant only insofar as it may relate to that issue and not for any other purpose. The defendant is on trial for the offenses charged in this bill of indictment only and not for any other acts.

Before you may consider any other alleged act, you must first determine whether the accused committed the other alleged act. If so, you must then determine whether the act sheds any light on the issue for which it was admitted in the crimes charged in the indictment in this trial. Such evidence is at most supporting evidence of some issues and may not, by itself, be the basis of conviction for the case on trial.

By giving this instruction, the Court in no way suggests to you that the defendant has or has not committed any other acts nor whether such acts, if committed, prove anything. This is a matter solely for your determination.

The court repeated this instruction, nearly verbatim, in its final charge.

21

is relevant to show . . . that the same defendant committed a similar act with the same sort of intent . . . .”). And it was undisputed that Appellant committed the Florida attack, so the third part of the test was satisfied as well.

Whether the trial court abused its discretion in evaluating the second part of the test — whether the probative value of the Florida evidence as to intent was substantially outweighed by its undue prejudicial effect — is a closer question. But we need not answer that question, because even assuming that the other acts evidence was improperly admitted, any such evidentiary error was harmless.[10] “‘[T]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.’” *Jackson v. State*, 306 Ga. 69, 80 (829 SE2d 142) (2019) (citation omitted). See also OCGA § 24-1-103 (a). “In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have

---

[10] Because the trial court instructed the jury that the evidence was admitted only for the purpose of showing intent, we do not address whether it may have been properly admitted for any other purpose.

done so." *Jackson*, 306 Ga. at 80 (citation and punctuation omitted).

We note first that as discussed in Division 1 (b) above, the other evidence of Appellant's guilt was strong. See, e.g., *Fletcher v. State*, 303 Ga. 43, 47 (810 SE2d 101) (2018) (concluding that the trial court's admission of other acts evidence was harmless in light of the strength of the other evidence against the appellant). As to the potential harmful effect of the other acts evidence, the trial court instructed the jury extensively both before the State presented the evidence of the Florida incident and again during the final charge that the evidence could be considered only for the limited purpose of showing Appellant's intent; that Appellant was on trial for the offenses charged in this case, not for any other acts; and that the evidence of the Florida incident, by itself, could not be a basis for conviction. We ordinarily presume that jurors follow their instructions. See *Bentley v. State*, 307 Ga. 1, 7 (834 SE2d 549) (2019); *United States v. Brown*, 665 F3d 1239, 1247 (11th Cir. 2011) (concluding under Federal Rule of Evidence 404 (b) that the trial court "gave a limiting instruction to the jury, which cured '[a]ny

23

possible unfair prejudice' posed by the 404 (b) evidence" (citation omitted)).

Furthermore, the Florida incident was not the sort of crime that poses a significant risk of inflaming the jury's passion. And when the evidence of that incident was presented, the jury learned that Appellant pled guilty to misdemeanor battery, was convicted of that crime, and served a prison sentence for his conduct. It was therefore less likely that the jury would have wanted to punish him for his past conduct rather than the charged crimes, particularly given the trial court's instruction about the limited use of the other acts evidence. See, e.g., *Taylor v. State*, 306 Ga. 277, 283 (830 SE2d 90) (2019) (holding that the admission of evidence about a prior crime under OCGA § 24-4-404 (b) was harmless, partly because the jury learned that the defendant had been punished for that crime and the trial court gave a limiting instruction about the use of the evidence).

Finally, Appellant argues that during the State's closing argument, the prosecutor suggested to the jury that the other acts

evidence proved Appellant's propensity to commit the charged crimes. Most of the prosecutor's comments about the evidence of the Florida incident, however, were focused on the issue of intent. And even if some of the comments could be interpreted as suggesting that the evidence showed Appellant's criminal propensity, the prosecutor also reiterated that the evidence was offered for the "very limited purpose" of showing intent and directed the jury's attention to the court's limiting instructions.[11] In any event, the trial court charged the jury that closing arguments are not evidence, that the court determines the law that applies and instructs on that law, and that the jury is bound by those instructions. See *Williams v. State*, 297 Ga. 460, 463 (773 SE2d 213) (2015). And as both the prosecution and the defense emphasized, the crucial issue in this case was the murderer's identity, not his intent, so additional evidence of intent — even if wrongly admitted — was of lesser importance to the jury's decision.

---

[11] Appellant did not object to the prosecutor's comments at trial, and he does not raise in this appeal any claim based on their alleged impropriety.

Considering all of these circumstances, we conclude that it is highly probable that the admission of the other acts evidence, even if erroneous, did not contribute to the jury's guilty verdicts. See, e.g., *Jackson*, 306 Ga. at 80-81; *Kirby*, 304 Ga. at 487; *Fletcher*, 303 Ga. at 47.

*Judgment affirmed in part and vacated in part. All the Justices concur, except Bethel, J., not participating.*

DECIDED FEBRUARY 10, 2020.
Murder. Whitfield Superior Court. Before Judge Morris.
*Lee W. Fitzpatrick*, for appellant.
*Herbert M. Poston, Jr., District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General,*

*Meghan H. Hill, Assistant Attorney General*, for appellee.