NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 16, 2025

S25A0917.  JESTER v. THE STATE.

WARREN, Presiding Justice.

Appellant Jquantae Jester was convicted of felony murder and concealing the death of another in connection with the killing of Myra Smith Parlier.[1]  Jester contends that the trial court erred by admitting other-acts evidence under OCGA § 24-4-404(b), by failing to instruct the jury on the statutory requirement of confession corroboration, and by admitting certain testimony.  Seeing no

[1] Parlier's body was found on January 16, 2022.  In May 2022, a Fulton County grand jury indicted Jester for malice murder, felony murder based on aggravated assault, aggravated assault, and concealing the death of another. After a mistrial in March 2023, the jury at Jester's second trial, which was held from May 17 to 30, 2023, found him not guilty of malice murder but guilty of the remaining counts.  The trial court sentenced him to serve life in prison without the possibility of parole for felony murder and 10 consecutive years for concealing the death of another; the court merged the aggravated-assault count. Jester filed a timely motion for new trial, which he later amended.  After a hearing, the trial court denied the motion in November 2024. Jester filed a timely notice of appeal, and the case was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

reversible error, we affirm.

1. The evidence presented at Jester's trial showed the following. On the afternoon of January 16, 2022, a man who was driving southbound on I-75 near Lake Allatoona discovered a large, black, plastic container wrapped with packing tape on the shoulder of the interstate. The man, who sometimes collected items of value from the roadway, pulled over, placed the container in his truck, and drove to his home in Cartersville. Inside the container, the man found a woman's dead body. The woman's body was covered with clothing and several pillows and blankets; a white trash bag covered her head; and a dog leash was around her neck. The man called 911.

Responding investigators transported the woman's body to the GBI, which later identified the woman as Parlier. The medical examiner who performed Parlier's autopsy concluded that there were abrasions on her neck that were consistent with someone pulling the dog leash around her neck. The examiner also testified that there was moisture inside the trash bag covering Parlier's head, indicating that Parlier was still breathing when the bag was placed

there. The examiner concluded that Parlier's death was caused by asphyxia.

Investigators determined Parlier's address in East Point and obtained a search warrant for her house. They found a pillow that was similar to a pillow found in the container; white trash bags and a dog leash that were similar to the trash bag and dog leash on Parlier's body; a large, empty space in a closet in a back room, indicating that the container had once been stored there; and an empty roll of packing tape on the dining room table.

In February 2022, a friend of Parlier's told investigators that Jester and his girlfriend Rashad Boone had spent time with Parlier in the fall and winter of 2021 and had sometimes slept in their car in Parlier's driveway because they were experiencing homelessness. Investigators obtained information from Parlier's EBT account showing that her EBT card was used several times after her body was found. Surveillance videos from the stores where the EBT card was used showed Jester and Boone making purchases around the times when the EBT card was used. Investigators arrested Jester

and Boone on unrelated charges on February 25, 2022.

Investigators searched a moving truck that Jester and Boone had been staying in and found several items that belonged to Parlier, including her identification cards, debit and credit cards, banking documents, social-security benefits documents, blank checks, and jewelry. Investigators also determined that after Parlier was killed, Jester (using a false name) used her debit card to pay for a motel room; the PIN number for Parlier's bank account and the limits on her ATM debit card were changed; someone attempted to deposit checks purportedly signed by Parlier; and $850 in cash was withdrawn from her account.

Jester was interviewed shortly after he was arrested on February 25; the interview was video-recorded and played for the jury at trial. He claimed that in early January 2022, he paid Parlier to use her EBT card and that when he later went to Parlier's house to return the card, she was not there, but a suitcase belonging to her was on her front porch. The suitcase contained several of Parlier's credit cards, and Jester and Boone put it in their moving truck so

4

they could return it to Parlier. Jester maintained that he did not use Parlier's credit cards.

On March 7, investigators interviewed Jester in the morning and again in the afternoon; those interviews were also video-recorded and played for the jury. During the morning interview, Jester repeated his story about finding Parlier's suitcase. Later that afternoon, however, Jester asked to speak to investigators again, saying that he would give "a full confession."[2] Jester stated that at some point, he learned that Parlier had sold a shotgun that he stored in her house. He went to Parlier's house to confront Parlier about it, and when she refused to tell him where the shotgun was, he "got angry." He grabbed a "rope from one of her ... robes" and "wrapped it around her throat and strangled her" and "took a bag and covered it over her head and [he] suffocated her." Jester held the bag there "until she stopped breathing," which "took a while." He then took a

<hr>

[2] Jester said that he would confess if Boone was not charged with any crimes. Investigators responded that they could not "make any deals" before determining whether Boone was involved.

"black," "hard plastic" container from the back room; wrapped Parlier in blankets; placed her in the container; and covered her with "pillows and stuff like that." He drove the moving truck to "the expressway" and disposed of the container. Jester then went back to Parlier's house, took her credit cards and financial documents, and put them in the moving truck. He later attempted to "pass" checks at Parlier's bank and paid a woman to withdraw $850 from Parlier's bank account for him.

Cell phone records for Parlier's phone showed that the last communication before her body was found on January 16, 2022, was sent at 7:45 p.m. on January 14. Cell-site location information ("CSLI") for a cell phone associated with Jester showed that on January 14, 2022, the phone was in the area of Parlier's house in the evening; on January 15, the phone was near Parlier's house throughout the evening and was moving north, consistent with traveling north on I-75, at 11:41 p.m. At 1:36 a.m., the phone was near Parlier's house again. And phone records for that phone showed that on the evening of January 15, the phone called a

6

number used to access EBT account information and that in the early morning hours of January 16, the phone called a customer service number and a technical support number for Parlier's bank. In addition, an expert in latent fingerprint analysis determined that Jester's fingerprints were on the container in which Parlier's body was found, on the packing tape securing the container, and on the trash bag covering Parlier's head.

At trial, Parlier's friend testified that when Jester learned that Parlier sold his shotgun, he was "upset" and he and Boone said that "they were good to her, and they couldn't believe that she would sell ... their things." Boone also testified that Jester was "upset" that Parlier sold his gun. Finally, the State presented other-acts evidence showing that in September 2015, Jester strangled another woman and threatened to kill her; he later pled guilty to false imprisonment in connection with that incident.

Jester testified in his own defense as follows. He and Boone often stayed in Parlier's driveway; they helped her around the house; and they sometimes paid her for the use of her EBT card.

7

Jester last saw Parlier around January 8, 2022, when he took her shopping, and Parlier said that he and Boone could "hold on to" her EBT card. Parlier gave Boone "a lot of jewelry," and Jester found Parlier's credit cards and financial information in the suitcase on her porch. He falsely confessed to investigators because he was "confused" and because he felt "obligated" to "sacrifice" himself so that Boone would not be charged. He denied any involvement in Parlier's murder.

2. Jester contends that the trial court abused its discretion by admitting other-acts evidence under OCGA § 24-4-404(b), which says that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but that such evidence may be admissible for other purposes, including to prove "motive" and "intent." As explained below, we conclude that any error in the admission of this evidence was harmless.

(a) At a pretrial hearing, the prosecutor proffered that the other-acts evidence would show that about six years before Parlier's

8

murder, Jester held another woman, Octavia Everett, captive, strangled her, and threatened to kill her; he was arrested and tried on charges related to that conduct; and after the trial ended in a mistrial, he pled guilty to false imprisonment. Over Jester's objection, the trial court ruled that the other-acts evidence would be admitted for the purposes of showing Jester's motive and intent.

At trial, the State presented the other-acts evidence by reading into the record a transcript of Everett's testimony during Jester's trial on the charges in that case, which showed as follows.[3] Around 2:00 a.m. on September 18, 2015, Everett met Jester at a friend's house, and they eventually walked toward Jester's house together. When they arrived, Jester grabbed Everett and dragged her into the house, where he hit her, slapped her, and threatened to kill her. She took her clothes off, and Jester slammed her on the ground and slapped her while she kicked and screamed. Jester then "repeatedly choked" Everett "until [she] almost stopped breathing." Jester

---

[3] The prosecutor represented that Everett had since died and was therefore unavailable to testify in this case.

eventually walked with Everett to her house, and she later reported the incident to law enforcement officials. After Everett's testimony was read into the record, the prosecutor introduced into evidence Jester's 2018 guilty plea to false imprisonment, for which he was sentenced as a first offender to serve five years in prison and five years on probation.

(b) Assuming (without deciding) that the trial court abused its discretion by admitting the other-acts evidence for the purposes of showing Jester's motive and intent, any such error was harmless. The test for determining nonconstitutional harmless error is "whether it is highly probable that the error did not contribute to the verdict." *Boone v. State*, 321 Ga. 820, 827 (2025) (quotation marks omitted). In making this determination, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." Id. (quotation marks omitted).

To begin, we acknowledge that Jester's attack on Everett was a serious and violent act. But the risk of potential unfair prejudice from the jury hearing evidence of that act was offset by the other,

10

properly admitted evidence of Jester's guilt, which was overwhelming. Two witnesses testified that Jester was "upset" with Parlier because she sold his shotgun. And Jester confessed to investigators that when he confronted Parlier about the gun, he became angry, strangled her, held a bag over her head until she stopped breathing, and put her body in a container. Jester's fingerprints were on the container, the tape securing it, and the bag covering Parlier's head. CSLI showed that on the evening before Parlier's body was found, Jester's phone was near Parlier's house and then traveled toward the location where the body was dumped. Later that night and early the next morning, Jester's phone called phone numbers dedicated to EBT information and banking information for Parlier's bank. Parlier's EBT card, credit cards, checks, and other financial information were found in Jester's moving truck, and Jester used Parlier's EBT card and credit card and withdrew money from her bank account after she was murdered. And Jester's claim at trial that he falsely confessed was not plausible, given that the detailed account of the murder he

11

provided to investigators was amply corroborated by other inculpatory evidence. See, e.g., *Boone*, 321 Ga. at 827–28 (pretermitting whether the trial court abused its discretion by admitting other-acts evidence and concluding that any error was harmless, "in light of the overwhelming evidence of [the appellant's] guilt," which included his own admission to investigators that he killed the victim); *Thomas v. State*, 314 Ga. 681, 688 (2022) (explaining that the improper admission of other-acts evidence showing that the appellant committed a prior shooting created a "risk of prejudice and confusion of the issues," but that such a risk was offset by the strong evidence of his guilt of the charged crimes).

In addition, the trial court instructed the jury before opening statements, before the other-acts evidence was presented, and again during the final charge about the limited purposes for which the evidence was admitted. Specifically, the court instructed that the other-acts evidence was admitted for the purposes of showing motive and intent; the jury could consider the other-acts evidence only for those purposes; Jester was on trial only for the offenses charged in

12

the indictment and not for the other act; and the jury could not infer from the other-acts evidence that Jester was of a character that would commit the charged crimes. We ordinarily presume that jurors follow such instructions. See, e.g., *Howell v. State*, 307 Ga. 865, 875 (2020) (explaining that the trial court's extensive instructions about the limited use of other-acts evidence, which the jury presumably followed, reduced the harmful effect of the evidence).

Moreover, the purposes for which the jury was instructed to use the other-acts evidence had little bearing on the crucial issues at trial. The State was not required to prove motive to establish Jester's guilt. See *Pritchett v. State*, 314 Ga. 767, 779 (2022). And intent was not a significant issue in the case: Jester's defense was that someone else killed Parlier, not that he did so without the requisite intent. See *Howell*, 307 Ga. at 876 (explaining that even if other-acts evidence was wrongly admitted for the purpose of showing intent, the evidence "was of lesser importance to the jury's decision" because "the crucial issue in th[e] case was the murderer's

identity, not his intent").

In sum, even if the trial court abused its discretion by admitting the other-acts evidence, it is highly probable that any such error did not contribute to the verdicts. Accordingly, this claim fails. See, e.g., *Thomas*, 314 Ga. at 688 (holding that the erroneous admission of other-acts evidence to prove motive and intent was harmless, because the evidence of the appellant's guilt was strong and the trial court instructed the jury that it could consider the other-acts evidence only for certain limited purposes and could not consider it as evidence of the appellant's criminal propensity); *Ash v. State*, 312 Ga. 771, 781–83 (2021) (concluding that any error in the admission of other-acts evidence to prove intent was harmless because the evidence of the appellant's guilt was strong, the trial court charged the jury about the limited use of the other-acts evidence, and intent was not a central issue in the case).[4]

---

[4] Although the parties do not mention it in their appellate briefs, we note that the prosecutor made several statements during his opening statement and closing argument suggesting to the jury that the other-acts evidence showed Jester's propensity to strangle women. Jester did not object to these

14

3. Jester also contends that the trial court erred by failing to instruct the jury on the statutory requirement of confession corroboration. See OCGA § 24-8-823 (providing, in pertinent part, that "[a] confession alone, uncorroborated by any other evidence, shall not justify a conviction"). As Jester acknowledges, his trial

---

statements at trial, and he does not raise any claims about them in this appeal. But in assessing whether the admission of other-acts evidence was harmless, we often consider, among other things, the arguments the State made about the other-acts evidence. Compare *Harris v. State*, 321 Ga. 87, 105 (2025) (concluding that the erroneous admission of "powerful and highly prejudicial" other-acts evidence was not harmless, in part because the State emphasized that the evidence showed the appellant's criminal propensity) with *Lee v. State*, 917 SE2d 683, 692 (2025) (holding that any error in the admission of other-acts evidence was harmless and noting that the State did not "use the kind of propensity-based language or arguments that we have considered especially damaging when assessing harmless error").

While the prosecutor's propensity-based arguments about the other-acts evidence in this case were improper, we note that the trial court charged the jury that opening statements and closing arguments are not evidence, that the trial court instructed the jury on the law, and that the jury was required to apply the law that the court provided. And in light of the overwhelming evidence of Jester's guilt, the trial court's instructions about the jury's use of the other-acts evidence, and the limited role that the issues of motive and intent played in the case, the inappropriate way in which the prosecutor used the other-acts evidence does not alter our conclusion that any error in the admission of the evidence was harmless. See *Howell*, 307 Ga. at 876 (explaining that even if the prosecutor made some comments during his closing argument suggesting that the other-acts evidence showed the appellant's criminal propensity, the trial court charged the jury that closing arguments are not evidence and that the court instructed the jury on the law; and ultimately holding that any error in the admission of the other-acts evidence was harmless).

15

counsel did not request such an instruction and did not object to its omission, so we review this claim for plain error only. See OCGA § 17-8-58(b); *Hart v. State*, 917 SE2d 631, 645 (2025).

To succeed on his claim of plain error, Jester must show that the alleged error was not affirmatively waived; was clear and obvious beyond reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *Hart*, 917 SE2d at 645. Because an appellant must establish all four elements of this test, demonstrating plain error "is difficult, as it should be." Id. (quotation marks omitted).

Here, Jester has not met his burden of showing that the omission of an instruction on the requirement of confession corroboration likely affected the outcome of his trial. "Although a confession alone cannot sustain a conviction, no specific manner of corroboration of the confession is required, and corroboration in any particular is sufficient." *Hooper v. State*, 313 Ga. 451, 455–56 (2022) (quotation marks omitted). The State presented ample evidence

16

corroborating many particular aspects of Jester's confession. Two witnesses testified that Jester was upset with Parlier about the sale of his shotgun, which corroborated Jester's statement to investigators that he "got angry" when he confronted Parlier about the gun sale. The State also presented substantial forensic evidence corroborating Jester's account of the murder, including the medical examiner's conclusions about the manner of Parlier's death and evidence that Jester's fingerprints were on the bag he told investigators he held over Parlier's head and on the "black," "hard plastic" container he admitted he used to conceal Parlier's body. Evidence indicating that the container had been stored in a closet in a back room in Parlier's house aligned with Jester's statement that he took the container from the back room, and evidence that Parlier's body was covered with clothing, pillows, and blankets corresponded with Jester's statement that he wrapped Parlier in blankets and covered her with "pillows and stuff like that." In addition, CSLI showing that Jester's phone traveled toward the location where Parlier's body was found on the shoulder of the

17

interstate supported Jester's statement that he dumped the body near the "expressway." And evidence indicating that after Parlier's murder, Jester used Parlier's EBT and credit cards, attempted to deposit checks purportedly signed by Parlier, and withdrew $850 in cash from her bank account corroborated Jester's statements that he stole Parlier's credit cards and financial documents, attempted to "pass" checks at Parlier's bank, and paid a woman to withdraw $850 from Parlier's bank account.

Although Jester made a few statements to investigators that were not supported by independent evidence (such as Jester's statement that he used a "rope" from Parlier's "robe[]" to strangle her), the extensive evidence corroborating numerous key aspects of his confession was more than sufficient to satisfy OCGA § 24-8-823. See *McMullen v. State*, 300 Ga. 173, 175 (2016) (rejecting the appellant's argument that the State was required to introduce evidence corroborating his statement that he used his handgun to shoot the victim because "no specific manner of corroboration is required, and corroboration in any particular is sufficient").

18

Accordingly, Jester has not shown that the trial court's omission of a jury instruction on the requirement of confession corroboration likely affected the outcome of his trial, and he cannot succeed on his claim of plain error. See *Hart*, 917 SE2d at 645 (concluding that the appellant could not show that the omission of an instruction on confession corroboration likely affected the outcome of her trial because "there was sufficient corroboration of [the appellant's] statements"); *Davis v. State*, 316 Ga. 418, 423 (2023) (holding that the appellant could not show that the trial court's failure to instruct on confession corroboration likely affected the outcome of his trial because "there was ample, strongly inculpatory corroborating evidence"); *Hooper*, 313 Ga. at 456–57 (explaining that the appellant did not establish that the failure to charge the jury on confession corroboration likely affected the outcome of the trial because "several particulars of [the appellant's] statements were corroborated," such that "there was ample corroborating evidence").

4. Finally, Jester claims that the trial court erred by admitting testimony from an expert witness in latent print examination

because the State allegedly failed to include her on its witness list, see OCGA § 17-16-8(a), and failed to permit the defense to inspect and copy her scientific report, see OCGA § 17-16-4(a)(4). Although Jester raised an objection at trial to testimony from a different witness on the ground that the witness was not included on the State's witness list (and the trial court sustained that objection and excluded the witness's testimony), Jester did not mention to the trial court the alleged discovery violations with respect to the expert witness he now complains about. Because Jester did not object to the admission of this witness's testimony on the ground that the State committed the discovery violations Jester alleges, we review this claim, too, for plain error only. See OCGA § 24-1-103(d); *Arnold v. State*, 321 Ga. 434, 446 (2025). See also *Jennings v. State*, 318 Ga. 579, 587 (2024) (reviewing the appellant's claim of evidentiary error for plain error because the appellant failed to make a specific objection at trial to the admission of the evidence on the grounds asserted on appeal).

Even assuming that the State failed to comply with OCGA §§

17-16-8(a) and 17-16-4(a)(4), Jester has not established that the trial court clearly and obviously erred by not excluding the expert's testimony. OCGA § 17-16-6 provides that if the State does not follow the discovery procedures in OCGA §§ 17-16-8(a) and 17-16-4(a)(4), the trial court may elect to impose various remedies, including ordering the State to permit the discovery, allowing the defense to interview the witness who was not disclosed, granting a continuance, or "upon a showing of prejudice and bad faith, prohibit[ing] the state from ... presenting the witness not disclosed." The exclusion of evidence is not required under OCGA § 17-16-6, and of the available remedies "is a particularly harsh sanction that should be imposed only where there is a showing of bad faith by the party that has failed to comply with its discovery obligation and prejudice to the other party." *State v. Bryant*, 307 Ga. 850, 853 (2020) (quotation marks omitted).

Although Jester asserts in his appellate brief that the State's alleged failure to comply with its discovery obligations was "blatant and intentional," he did not bring to the court's attention any alleged

21

discovery violations with respect to the expert witness during the trial, and there is no indication in the record that the court was (or should have been) aware of any such alleged violations. See *Knighton v. State*, 310 Ga. 586, 594 (2020) (explaining that under the plain-error test, the error must be so obvious that "'the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it'" (quoting *United States v. Frady*, 456 US 152, 163 (1982))). Moreover, Jester has offered no evidence showing that the State acted in bad faith, and nothing in the record indicates as much. Thus, even if the trial court had been made aware of the discovery violations Jester now alleges, Jester has not met his burden of showing that the court should have imposed the sanction of excluding the expert witness's testimony.[5]

Because Jester has not established that the trial court committed a clear and obvious error by not excluding the expert's testimony under OCGA § 17-16-6, he has not shown plain error, and

---

[5] Jester does not contend in his appellate brief that the trial court (had it been aware of the alleged discovery violations) should have imposed a remedy other than the exclusion of the expert witness's testimony.

22

this claim fails. See *Muse v. State*, 316 Ga. 639, 661 (2023) (holding that the appellants did not establish, under the plain-error test, that the trial court clearly and obviously erred by failing to exclude certain evidence on the ground that the State committed a discovery violation, because the appellants did not offer any evidence showing that the State acted in bad faith, such that they had not shown that the trial court would have excluded the evidence under OCGA § 17-16-6); *Grier v. State*, 313 Ga. 236, 242 (2022) (concluding under plain-error review that the appellant had not shown that the trial court clearly and obviously erred by failing to exclude testimony on the ground that the State did not provide proper notice, because the trial court would not have excluded the testimony absent a showing of bad faith and prejudice).[6]

---

[6] Jester does not argue that the errors he alleges, when considered cumulatively, resulted in prejudice sufficient to order a new trial. Even assuming that the evidentiary error and the instructional error that we assumed above can be aggregated for cumulative-error review, we discern no cumulative prejudice. See *Guyton v. State*, 321 Ga. 57, 64 n.7 (2025) (explaining that "[a] defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors" (quotation marks omitted)).

*Judgment affirmed. All the Justices concur.*