**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be physically received in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.**

**November 1, 2021**

# In the Court of Appeals of Georgia

A21A1108. MOODY v. THE STATE.

DOYLE, Presiding Judge.

Following the trial court's denial of his motion for new trial, Kenyatta Moody appeals from his convictions of aggravated assault and battery. He contends that (1) the trial court erred by admitting other-act evidence, (2) his trial counsel provided ineffective assistance by failing to object to portions of the State's closing argument, and (3) his due process rights were violated when the trial court denied his request to be physically present for the hearing on his motion for new trial. For the following reasons, we affirm.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence. We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether the

evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt.[1]

So viewed, the evidence at trial established that in January 2017, the victim was driving to her home with a friend when she noticed that an elderly neighbor's front door was "wide open." Thinking that something may have happened to her neighbor, she stopped her car and went inside his home "to check on him," while her friend stayed in the car. As she walked across his yard, she noticed another neighbor, Moody, walking down the street; she had arranged for Moody to give the neighbor a ride to the bank a few days earlier. She went inside the house and determined that her neighbor was okay and "just relaxing" with his door open.

The victim was surprised when Moody walked into the house and told the neighbor that he "and [his] cousin [are] going to come and clean your house up." The victim testified that when Moody

> walked in[, the neighbor] said who is that, I don't know him? Of course he knows him, he took him that time to the bank, but [his] memory ain't going to be like that to know that person, he don't know him, he just know that person took him to the bank. So he told him that. . . . And [the

---

[1] (Citation and punctuation omitted.) *Smith v. State*, 348 Ga. App. 643, 644 (824 SE2d 382) (2019).

neighbor] looked at me and said I don't know him and I want him to leave.

The victim testified that when she asked Moody to leave, the "[n]ext thing [she] knew [she] was on the floor." While she was down on the floor, Moody "kept stomping and stomping . . . [her] head on that wood floor." She testified that she was scared and afraid she would die. At some point Moody stopped, and she stumbled outside and asked a young lady with a cell phone in her hand to call 911. The victim testified that when a police officer arrived, he refused to take a statement because she "was too belligerent." The victim went to the hospital first thing the next morning, and her injuries included a bloody lip, gums, and nose; a loose tooth; swollen lips and eye; bruises; a hematoma; and an "awful headache." She later identified Moody in a line-up and at trial. She explained that she refused to go to the hospital in an ambulance right after the incident because she needed to pick up her granddaughter from day care.

During cross-examination, the victim acknowledged that she had no prior arguments with Moody and that she was unaware of any prior difficulties between Moody and her neighbor. She agreed with defense counsel's statement that "according to you[,] this person who had no argument with you at all, no argument

3

with [the neighbor], just comes into the house, picks a fights and throws you to the ground and stomps you in the head[.]" She explained that she thought it happened because "I don't think he liked a woman telling him to do anything or to leave. We did argue, next thing I know I was on the . . . wood floor."

The State played for the jury a recording of a 911 call placed by the elderly neighbor. In the call, the neighbor asked for a police officer to come to his house because "they took a man to the police[,] . . . they arrested a man[,] . . . and I need to know what to do."

The neighbor testified that he had a hard time remembering what had happened between the victim and Moody. The neighbor did recall a man entering his home, he responded affirmatively when asked whether the man "hit [the victim] or [did] anything to her." According to the neighbor, "[t]here must have been something going on previously between the two that I never understood and I cannot contemplate, I cannot make an assumption."

The friend who was in the victim's car waiting outside the neighbor's house during the incident testified that she heard a noise after the victim went inside that sounded "like furniture being thrown to the ground." When the victim came out of the house, "she was squatting down, [and] she had blood coming from her nose and

4

mouth[,] and she said [Moody] jumped me, call the police." The friend also saw Moody exit the house, go to his car, and drive away; as he was walking, Moody stated, "I told her I was going to beat her ass."

A police officer testified that the victim came into the precinct a couple of days after the incident and reported that Moody had assaulted her. Police placed Moody in a six-person photo lineup, and the victim identified him as the man who had assaulted her. When the officer spoke with the elderly neighbor about the incident, the neighbor stated that the victim and Moody came into his house "and then they got into a fight." The neighbor said that Moody attacked the victim; he did not tell the officer that the victim attacked Moody. The testifying officer had no explanation for why the responding officer did not complete a report; this officer no longer worked for the police department at the time of the trial.

The State presented the testimony of two witnesses to prove a previous assault by Moody in 2012. A police officer testified that in February 2012, he received a domestic dispute call and went to the residence of Moody's mother. She told him that her son was angry with her about "something she said" in another location. When they returned home, he wanted some items back from her, they got into an argument, and "she told him to get out of her house. . . . So he got mad . . . and threw her on the

5

floor and punched her in the face several times." After punching his mother, Moody forced her into a room, took her cell phone while he packed his bags, and then left. The police officer observed blood throughout the house and the mother's top lip "hanging down."

Moody's mother testified that she could not recall the 2012 incident with Moody, and she denied telling the police that he attacked her.. The State tendered and the trial court admitted a certified copy of Moody's *Alford*[2] plea for aggravated battery, aggravated assault, robbery by intimidation, false imprisonment, and hindering an emergency telephone call.

In closing argument, Moody's trial counsel asserted:

> There's more here going on than meets the eye. There's more here going on than what we have been told. Clearly we are not getting the whole story here, there must be more to it.

> Who just hauls off — according to her, tosses her on the ground and starts stomping her on the head repeatedly. No provocation, no reason at all. That makes no sense. That defies common sense. . . . She's not telling everything that happened that day.

---

[2] *North Carolina v. Alford*, 400 U.S. 25 (91 SC 160, 27 LE2d 162) (1970).

So officers responded, [and] declined to take a report, apparently due to what she called . . . her own hostility.

In response, the State asserted in its closing that Moody's mother

told him no, you can't be here anymore. The same thing [the victim] told him in 2017.

The same exact thing. He was being told no by somebody, again, that he doesn't have respect for. He doesn't have respect for his own mama enough not to beat her.

Surely some woman who he doesn't really know. What is he to her? He doesn't have to respect her. And on that day he didn't respect her.

. . .

And I present to you that you are getting the full story. And that the full story is that when this [d]efendant was told no and told he couldn't be somewhere that he thought he had authority to be that he resorted to violence. That's what the evidence has shown you today.

The trial court instructed the jury about the limited purpose of the other-act evidence (intent, motive, and identity) both before it was admitted during the trial and in its final charge. It also gave an instruction on an *Alford* plea, explaining that it is

7

"a plea of guilty in one's best interest . . . [and that] a [c]ourt may accept the guilty plea even if the Defendant insists that he or she is innocent . . . [, but it] should not be accepted unless there's a factual basis for the plea."

1. *Other act evidence*. Moody contends that the trial court erred by admitting the 2012 incident between him and his mother for the purposes of intent, motive, and identity. With regard to motive and identity, Moody asserts that the 2012 incident was not relevant. While he concedes that it "was relevant to intent," he contends that its prejudicial effect outweighed any probative value on the issue of intent.

Pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)"), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith." However,

> such other[-]acts evidence is admissible for other purposes, including to prove intent, motive, and absence of mistake or accident. The party offering evidence under Rule 404 (b) must show three things: (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof

8

for a jury to find by a preponderance of the evidence that the defendant committed the other act.[3]

"A trial court's decision to admit other[-]acts evidence will be overturned only where there is a clear abuse of discretion."[4] "Relevant evidence" is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[5] "This is a binary question — evidence is either relevant or it is not."[6]

(a) *Intent*. The Supreme Court of Georgia has "explained that where the intent required for the charged offenses and other acts is the same, and intent is at issue, the first prong of the Rule 404 (b) test is satisfied."[7] Here, Moody placed his intent at issue by pleading not guilty and taking no affirmative steps to relieve the State of its

---

[3] (Citation and punctuation omitted.) *Strong v. State*, 309 Ga. 295, 299 (2) (a) (845 SE2d 653) (2020).

[4] (Citation and punctuation omitted.) *Moton v. State*, 351 Ga. App. 789, 792 (833 SE2d 171) (2019).

[5] OCGA § 24-4-401.

[6] *Strong*, 309 Ga. at 301 (2) (a).

[7] (Citation and punctuation omitted.) *Castillo-Velasquez v. State*, 305 Ga. 644, 647 (2) (827 SE2d 257) (2019).

burden to prove intent.[8]In this case, the State charged him with aggravated assault by using a means likely to cause serious bodily injury and battery; in the 2012 incident, Moody was charged with aggravated battery and aggravated assault. Because these crimes involved the same sort of intent, they were relevant to show Moody's intent here.[9]

> The Supreme Court of Georgia has cautioned that while

> other[-]act evidence may be relevant to proving the general intent element of a charged crime, when applied to the many violent crimes that require only general intent, [it] should not be viewed by prosecutors or trial courts as an open invitation to admit evidence of marginally similar violent acts that involve the same general intent. Because general intent is not meaningfully disputed in many cases, while evidence that the defendant committed other violent acts is often quite prejudicial, trial courts should be especially careful in conducting the OCGA § 24-4-403 balancing in this context. Prosecutors and courts should also

---

[8] See id. at 647 (2).

[9] See *Howell v. State*, 307 Ga. 865, 874 (3) (838 SE2d 839) (2020) (prior assault and battery relevant to show intent in subsequent aggravated assault and aggravated battery case); *Olds v. State*, 299 Ga. 65, 72 (2) (786 SE2d 633) (2016) ("evidence that an accused committed an intentional act generally is relevant to show . . . that the same defendant committed a similar act with the same sort of intent").

be wary of the temptation to use evidence that was admitted solely to show intent for other purposes, such as to argue identity or motive.[10]

Accordingly, we will also determine whether the other-act evidence in this case was properly admitted for identity and motive.

(b) *Identity*.

Evidence offered to prove identity must satisfy a particularly stringent analysis. When extrinsic offense evidence is introduced to prove identity, the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused. In other words, the evidence must demonstrate a modus operandi. The extrinsic act must be a "signature" crime, and the defendant must have used a modus operandi that is uniquely his. The signature trait requirement is imposed to ensure that the government is not relying on an inference based on mere character — that a defendant has a propensity for criminal behavior. Evidence cannot be used to prove identity simply because the defendant has at other times committed the same commonplace variety of criminal act.[11]

---

[10] (Citation and emphasis omitted.) *Jackson v. State*, 306 Ga. 69, 80 (2) (b) (ii) n.12 (829 SE2d 142) (2019).

[11] (Citation and punctuation omitted.) *Brooks v. State*, 298 Ga. 722, 725 (2) (783 SE2d 895) (2016).

"The inference of identity flowing from the other crime 'must be extremely strong' and 'bear such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual.'"[12]

In this case, "the two crimes, though similar, were not sufficiently uncommon so as to constitute a signature crime, [and] the prior crimes were not admissible under Rule 404 (b) to prove identity."[13] Accordingly, the trial court erred by admitting the other-act evidence for the purpose of showing identity.

(c) *Motive*. As the Supreme Court of Georgia has explained, "[t]o properly show motive, the extrinsic evidence must be logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged."[14] "To rule otherwise would make all prior robberies admissible in any robbery case, all prior murders admissible in any murder case, and so on."[15] Accordingly, the Supreme Court of Georgia has rejected the following arguments for admissibility of other acts to

---

[12] (Citations and footnotes omitted.) *Amey v. State*, 331 Ga. App. 244, 250 (1) (a) (770 SE2d 321) (2015).

[13] *Moon v. State*, ___ Ga. ___, ___ (3) (c) (iii) (860 SE2d 519) (2021).

[14] (Citation and punctuation omitted.) *Strong*, 309 Ga. at 312 (2) (d) (2).

[15] (Citation and punctuation omitted.) *Brooks*, 298 Ga. at 726 (2).

12

show motive as they were "classic improper propensity argument[s]": "evidence of [defendant's] other violent acts was relevant to show that he 'believed it acceptable to engage in gun violence to solve disputes'"[16]; "evidence of Appellant's other violent acts was relevant to show that his 'motive is to control other people' with violence — 'whenever a person doesn't submit to his control, he reacts with violence'"[17]; and "the fact that Appellant committed other violent crimes against women showed his 'inclination' to use violence to obtain money and sex."[18]

Here, the State asserts that the trial court properly admitted the other-act evidence to show motive because it showed that when Moody is "asked to leave a location by an older woman, [he] considers that sufficient provocation to strike that woman in the face repeatedly. . . ." This is the classic propensity argument used "to prove the character of a person in order to show action in conformity therewith" that

---

[16] *Moon*, ___ Ga. at ___ (3) (c) (ii).

[17] *Strong*, 309 Ga. at 312 (3) (d) (2).

[18] *Kirby v. State*, 304 Ga. 472, 487 (4) (b) (819 SE2d 468) (2018).

is not permitted by Rule 404 (b). Therefore, the trial court erred by admitting such evidence for the purpose of motive.[19]

While the State relies upon *Smart v. State*,[20] and *Chambers v. State*,[21] to assert that the other-act evidence could be admitted for motive, these cases are distinguishable. In these cases, the other-act evidence was used to show that the defendant "used violence to control [his wife,]"[22] or "resorted to violence to assert control over his female partners."[23] As the Supreme Court of Georgia intimated in *Strong*, the use of prior acts to show that "domestic violence may be motivated by a defendant's desire to control his intimate partner with threats and assaults[,]" is not appropriate when the charged crime does not involve intimate partners.[24]

(d) *Prejudice*. Having concluded, however, that the trial court properly admitted the other-act evidence for the purpose of intent, we now turn to whether it

---

[19] See *Moon*, Ga. at ___ (3) (c) (ii); *Strong*, 309 Ga. at 312 (3) (d) (2); *Kirby v. State*, 304 Ga. 472, 487 (4) (b) (819 SE2d 468) (2018).

[20] 299 Ga. 414 (788 SE2d 442) (2016).

[21] 351 Ga. App. 771 (833 SE2d 155) (2019).

[22] *Smart*, 299 Ga. at 418 (2) (a).

[23] *Chambers*, 351 Ga. App. at 778 (2).

[24] *Strong*, 309 Ga. at 312 (2) (d) (2) n.19.

should have been excluded under OCGA § 24-4-403 ("Rule 403") because "its probative value [wa]s substantially outweighed by the danger of unfair prejudice[.]"[25] "To determine whether relevant evidence is more probative than prejudicial, our Supreme Court has explained that, generally speaking, the greater the tendency to make the existence of a fact more or less probable, the greater the probative value."[26] And, "the extent to which evidence tends to make the existence of a fact more or less probable depends significantly on the quality of the evidence and the strength of its logical connection to the fact for which it is offered."[27] The Rule 403 analysis "requires a common sense assessment of all the circumstances surrounding the extrinsic act and the charged offense" including "the prosecutorial need for the extrinsic evidence, the overall similarity between the extrinsic act and the charged offense, and the temporal remoteness of the other act."[28] "[When] reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission,

---

[25] (Citation and punctuation omitted.) Id. at 301 (2) (a).

[26] (Citations and punctuation omitted.) *Chambers*, 351 Ga. App. at 778 (2).

[27] *Olds*, 299 Ga. at 75 (2).

[28] (Citations and punctuation omitted.) *Jernigan v. State*, 357 Ga. App. 415, 422-423 (2) (a) (ii) (848 SE2d 707) (2020).

15

maximizing its probative value and minimizing its undue prejudicial impact."[29]

Moreover, "when other-acts evidence is introduced to prove intent as opposed to identity a lesser degree of similarity between the charged crime and the extrinsic evidence is required."[30]

We recognize that the exclusion of evidence under Rule 403 (b) "is an extraordinary remedy which should be used only sparingly."[31] Nevertheless, in this case, the trial court abused its discretion by concluding that the probative value of Moody's prior convictions for the purpose of proving intent was not substantially outweighed by unfair prejudice.

There are some similarities between the two incidents, and the first is not too temporally remote to be probative. More importantly, however, there was no substantial prosecutorial need for the other-acts evidence. The instant crimes involved general intent, and neither party alleged that Moody's actions against the victim were

---

[29] (Citation and punctuation omitted.) *Green v. State*, 352 Ga. App. 284, 291 (2) (e) (834 SE2d 378) (2019).

[30] (Citation, punctuation, footnote and emphasis omitted.) *Jernigan*, 357 Ga. App. at 424 (2) (a) (ii). See *Burgess v. State*, 349 Ga. App. 635, 642 (3) (824 SE2d 99) (2019), overruled on other grounds, *Hill v. State*, 360 Ga. App. 143, 146, n.4 (860 SE2d 893) (2021).

[31] (Citation and punctuation omitted.) *Olds*, 299 Ga. at 70 (2).

16

unintentional.[32] Thus, the probative value of the evidence of the 2012 attack on his mother to prove Moody's intent in the charged crimes was minimal.[33] And "[o]n the other side of the OCGA § 24-4-403 balance, it is undoubtedly prejudicial to be labeled" a man with no respect for women, including his own mother, who beats them when asked to leave.[34] "In sum, the unfair prejudice from the other act evidence clearly and substantially outweighed its minimal probative value, and the trial court therefore abused its discretion by admitting the evidence."[35]

---

[32] See *Jackson*, 306 Ga. at 78-79 (2) (b) (ii) (explaining that "'if the State's threshold to prove intent as an element of a crime is relatively low, as it likely is when the charged crime is one of general intent, then the probative value of the extrinsic act evidence would necessarily be minimal."), quoting *Jones v. State*, 301 Ga. 544, 548 (802 SE2d 234) (2017). See also *Kirby*, 304 Ga. at 486 (holding that a prior aggravated assault had minimal probative value as to intent because there was scant need for extrinsic evidence to show that the defendant intentionally stabbed the victim, who had been stabbed multiple times); *United States v. San Martin*, 505 F2d 918, 923 (5th Cir. 1974) ("Prior crimes involving deliberate and carefully premeditated intent — such as fraud and forgery — are far more likely to have probative value with respect to later acts than prior crimes involving a quickly and spontaneously formed intent — such as assault.") (punctuation omitted).

[33] See id. at 79 (2) (b) (ii).

[34] Id.

[35] Id. at 80 (2) (b) (ii).

(e) *Harm*. "Not all trial errors require reversal, however; a defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials."[36] Therefore, having concluded that the trial court erred by admitting the other-act evidence, we must now determine whether it entitles Moody to a new trial or was harmless error.

> The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether trial court error was harmless, we 'review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict.[37]

Doing so here, "we conclude that it is highly probable that the trial court's error in admitting [evidence of the 2012 incident between Moody and his mother] did not contribute to the jury's guilty verdict."[38]

The evidence that Moody committed aggravated assault and battery against the victim was overwhelming. Moody did not testify, leaving completely unrebutted: (1) testimony by the neighbor, the victim, and her friend waiting in the car that Moody

---

[36] (Punctuation omitted.) *Peoples v. State*, 295 Ga. 44, 55 (4) (c) (757 SE2d 646) (2014).

[37] (Citations and punctuation omitted.) Id.

[38] Id.

and the victim were in the neighbor's home at the same time; (2) that after the victim

entered the neighbor's house, her friend waiting in the car heard what sounded like

furniture being thrown around, saw the victim's mouth and nose bleeding, and saw

Moody exit the neighbor's house, get into his car, and leave the scene; that Moody

exclaimed to the friend as he walked to his car, "I told her I was going to beat her

ass"; (3) the victim's testimony that she and Moody argued, and the next thing she

knew she was on the ground with Moody continuously "stomping and stomping. . .

[her] head on that wood floor"; and (4) that the victim went to the hospital the

following morning for her bloody lip, gums, and nose; a loose tooth; swollen lips and

eye; bruises; and a bad headache.

As to the potential harmful effect of the other-act evidence, the trial court

instructed the jury both before the admission of the evidence and in the general jury

charge at the close of the evidence that the other-act evidence could be considered

only for limited purposes and that Moody was only on trial for the offenses charged

in this case.[39] The jury was advised of the nature of Moody's prior *Alford* plea, was

instructed that the argument of counsel was not evidence, and was aware that Moody

had been sentenced to 18 months in prison, which makes it "less likely that the jury

---

[39] See *Howell*, 307 Ga. at 875 (3).

would have wanted to punish him for his past conduct rather than the charged crimes."[40] Finally, Moody's mother testified at trial that she and Moody "don't argue" and that she did not recall the prior incident; she denied telling police that her son had attacked her.

> Considering the trial record as a whole, and weighing the evidence as we believe that reasonable jurors would, we are convinced that the jury in this case would have found [Moody] guilty of the same crimes had the . . . evidence [of his 2012 assault on his mother] not been erroneously admitted. Moreover, compared to the overwhelming other evidence of [Moody's] guilt, we do not view the [2012] evidence as particularly compelling or prejudicial. We therefore conclude that it is highly probable that the trial court's error in admitting the independent offense evidence did not affect the jury's verdict, and a new trial is not required.[41]

2. *Ineffective assistance*. Moody also contends that his trial counsel provided ineffective assistance by failing to object to portions of the State's closing argument. We find no basis for reversal.

During closing arguments, when addressing Moody's actions against the victim and against his mother, the State argued that Moody "doesn't like being told no" and

---

[40] Id. at 875-876 (3).

[41] *Peoples*, 295 Ga. at 58 (4) (c). See also *Howell*, 307 Ga. at 875-876 (3).

that "he's violent toward people he thinks are weak." Moody contends that trial counsel's failure to object to these statements constituted ineffective assistance.

To prevail on this claim, Moody must demonstrate that

his counsel's performance was professionally deficient and that he was prejudiced by the deficient performance. If an appellant is unable to satisfy one prong of the *Strickland v. Washington*[42] test, it is not incumbent upon [an appellate c]ourt to examine the other prong.

To prove deficient performance, [Moody] must show that his lawyer performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. . . .

To satisfy the prejudice prong, [Moody] must demonstrate a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. As [the Supreme Court of Georgia has] said before, satisfaction of this test is a difficult endeavor. Simply because a defendant has shown that his trial counsel performed deficiently does not lead to an automatic conclusion that he was prejudiced by counsel's deficient performance. An appellant bears the burden of satisfying both prongs of the *Strickland* test.[43]

---

[42] 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984).

[43] (Citations and punctuation omitted.) *Davis v. State*, 306 Ga. 140, 143-144 (3) (829 SE2d 321) (2019).

Pretermitting whether trial counsel performed deficiently by not objecting to the State's closing argument,

> [Moody] has failed to show a reasonable likelihood that, absent the failure of his lawyer to object to the prosecuting attorney's statements, the outcome of the trial would have been different. Not only did the State present substantial evidence of [Moody's] guilt, . . . the trial court also instructed the jury that closing arguments were not evidence. Accordingly, this claim fails.[44]

3. *Absence from motion for new trial hearing.* Finally, Moody alleges that his due process rights were violated when the trial court denied his request to be physically present for the hearing on his motion for new trial. We disagree.

Moody filed a motion to be physically present at the motion for new trial hearing.[45] Following a hearing, the trial court entered an order denying Moody's

---

[44] (Citations and punctuation omitted.) *Lane v. State*, ___ Ga. ___, ___ (2) (b) (Case No. S21A1029; decided Oct. 5, 2021).

[45] At the time the motion was filed, a statewide judicial emergency order was in effect. See *Copeland v. Copeland*, ___ Ga. ___, ___ n.3 ("On March 14, 2020, pursuant to OCGA § 38-3-62 and citing the public health emergency presented by the COVID-19 pandemic, Georgia Supreme Court Chief Justice Harold Melton issued an order declaring a statewide judicial emergency. Among other things, the judicial emergency declaration suspended, tolled, extended and otherwise granted relief from any deadlines or time schedules in civil and criminal cases. The order was set to expire on April 13, 2020, but was extended several times. . . . The judicial emergency orders . . . may also be viewed at the Georgia Supreme Court's website,

22

motion to be physically present, but provided him the opportunity to attend and testify via video conference. Moody testified via video conference at the motion for new trial hearing on various issues, including his interactions and communications with trial counsel. He now argues that the trial court's denial of his motion to be physically present mandates that he receive a new trial.

> In Georgia, the constitutional right of one accused of a felony to be present during the course of his trial does not extend to post-verdict procedures such as a motion for new trial. Rather, due process affords him the right to be present at such a hearing only if his presence would contribute to the fairness of the procedure. [If] the defendant's testimony would do nothing to support his claims of error, then due process does not require his presence.[46]

"Moreover, a defendant must show that harm as well as error resulted from the exclusion of testimony at the new trial hearing."[47]

---

www.gasupreme.us.").

[46] (Citations and punctuation omitted.) *Mantooth v. State*, 303 Ga. App. 330, 336 (2) (693 SE2d 587) (2010), quoting *Wallace v. State*, 294 Ga. App. 159, 161 (2) (669 SE2d 400) (2008); *Florescu v. State*, 276 Ga. App. 264, 267 (1) (c) (623 SE2d 147) (2005).

[47] *Barlow v. State*, 327 Ga. App. 719, 728 (5) (761 SE2d 120) (2014).

Here, Moody's arguments were that the trial court erred by admitting the prior-act evidence and that trial counsel was ineffective for failing to object to the State's closing argument; he did not testify on either of these subjects at the hearing. Moody has failed to show how his testimony at the motion for new trial hearing made physically in person, as opposed to via video conference, would support those arguments or otherwise "contribute to the fairness of the procedure,"[48] nor has he demonstrated that not being permitted to testify in person was harmful.[49] Thus, Moody has not shown reversible error.

*Judgment affirmed. Reese, J., concurs. Brown, J., dissents.*

---

[48] (Punctuation omitted.) *Mantooth*, 303 Ga. App. at 336 (2).

[49] See *Barlow*, 327 Ga. App. at 728-729 (5).

# In the Court of Appeals of Georgia

Brown, Judge, dissenting.

I agree that the trial court erred by admitting other-act evidence for the purpose of showing motive and identity and that the probative value of this evidence for the purpose of intent was substantially outweighed by the danger of unfair prejudice in this case. I respectfully dissent because I cannot say that the trial court's error in admitting evidence that Moody previously had beaten up his mother "did not contribute to the jury's guilty verdicts on the charged crimes," which also involved the assault of a woman, particularly when the State's attorney hammered an improper propensity argument during her closing and the trial court improperly instructed the

jury that it could use the other-act evidence as proof of motive. *Heard v. State*, 309 Ga. 76, 95 (3) (g) (844 SE2d 791) (2020).

"In determining whether trial court error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." (Citation and punctuation omitted.) *Heard*, 309 Ga. at 90 (3) (g). In this case, the State charged Moody with felony aggravated assault "by striking [the victim] about the head with [the] accused's feet, a means likely to cause serious bodily injury when used offensively against a person" and misdemeanor battery for "intentionally caus[ing] substantial physical harm or visible bodily harm [to the victim]."[1] While the majority points to other evidence showing that Moody committed an assault, the victim is the *only* witness who testified that Moody used his feet during the assault as alleged in the indictment.[2] A jury is not obligated to believe the victim's testimony,

---

[1] The trial court merged the battery count into the aggravated assault count at sentencing.

[2] The elderly neighbor, who was the only eyewitness, had a hard time remembering the incident, stating when asked about it for the first time at trial:

> That is where I dwell on this vividly for quite a bit now. I don't know which came first, the egg or the chicken comes first. There was somebody that I never saw before and I didn't know the essence of it. You know, talked to me outside. And I think my door was open because I didn't close my door, but I can't remember whether it was egg or

2

see *Scott v. State*, 307 Ga. 37, 41 (1) (b) (834 SE2d 88) (2019), and Moody's defense strategy was one of questioning the credibility of the victim and asserting that he committed misdemeanor battery rather than felony aggravated assault. His attorney argued in closing that the victim's story was incomplete and defied common sense, that the responding police officer refused to take her statement because she was too

chicken come first.

Asked if he remembered what happened when the man came into his house, he stated, "Once again, I repeat myself. Whether the chicken or the egg comes first, I did not know — I cannot recollect exactly, but I was there and somebody else was there." Asked if he knew whether something happened to the victim, he replied:

> Like I said, whether the chicken or the egg comes first, you know, I — that's one way I can express myself this — I met them individually, you know, it just happened. The individual come and like I said the chicken or the egg, I could not remember exactly, but in that order that's why I left door open because I, you know, and there was something going on between them. It was a situation or something, I don't know, I cannot speculate on that.

When asked if he saw someone hit the victim, he said "[t]here was an altercation going on in my living room with this chicken or the egg going on that make [sic] me uncomfortable." In a follow-up question, he agreed that he was uncomfortable "[w]ith the altercation going on . . . inside in the living room between the chicken and the egg. . . ." When asked if he saw "anybody hit [the victim] or do anything to [her,]" he replied: "Yes. I do not specifically see — I mean, you know, can't recollect, but I know the altercation was becoming so unbearable for me personally." He never explicitly identified Moody as the man who hit the victim and never stated that someone kicked the victim in the head.

3

belligerent, that her injuries did not match her assertion that Moody had stomped on her head numerous times, that if he had stomped on her head, she would have gone to the hospital and not gone home to sleep as it could have been dangerous, and suggested that perhaps Moody just pushed or knocked her to the floor without any repeated stomping as this would be more consistent with her injuries.

In my view, admission of the evidence that Moody previously had beaten his own mother would have an outsize effect on a reasonable jury's evaluation of the victim's credibility on the issue of whether Moody struck her in the head with his feet as alleged in the indictment. It is precisely the kind of "particularly compelling or prejudicial" other-act evidence which requires a finding of harm. *Peoples v. State*, 295 Ga. 44, 58 (4) (c) (757 SE2d 646) (2014). See also *Hill v. State*, 310 Ga. App. 695, 699 (2) (713 SE2d 891) (2011) ("we cannot say that the evidence of . . . guilt was overwhelming, given that the case turned *solely* on the credibility of . . . the victim, and the other witnesses") (punctuation omitted; emphasis supplied). I would therefore grant Moody a new trial untainted by the improper admission of the other-act evidence.